# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**OLIVIA PARROTT**
5804 Foote St NE, Apt 4
Washington, DC 20019-6937

and

**BARDINO GARLAND JOYNER**
PO Box 7
Mount Croghan, SC 29727

and

**DREYVON IRACKS**
4256 East Capitol Street, NE
Washington, DC 20019

Plaintiffs, on behalf of themselves and all
others similarly situated,

v.

**GOVERNMENT OF THE DISTRICT OF
COLUMBIA**,

400 6th Street, NW
Washington, DC 20001

Defendant.

Civil Action No: 21-2930 (RCL)

---

## AMENDED CLASS ACTION COMPLAINT

Amended Complaint for Judgment for Money Damages and Injunctive Relief and Declaratory

Relief with Jury Demand

1.      If you are working poor, and the government takes the car you depend on to get to and from work, and the smartphones you rely on to coordinate your life and work schedule, and manage your household accounts, you are no longer working poor, you are just poor.

2.      The District through its MPD runs a system for seizing vehicles and smartphones and other property in connection with criminal investigations to check them for the "potential evidence" that might be in them, without providing corresponding regular procedures for the prompt return of the property after the government no longer needs it, and without implementing the procedures it does have in a constitutional manner.[1]

3.      The District's system gives great weight to the government's interest in preserving and obtaining "potential evidence" but it gives zero weight to property owners' important rights in their vehicles and smartphones which waste away while in government custody and continue to consume owners' resources to maintain.

4.      The MPD classifies the vehicles and smartphones as "evidence" according to its own policy statements and it controls the classifications and the timing of seeking "no objection" forms (PD 81-Cs) from prosecutors (which it requires by virtue of its own policy statements) so the MPD's policies and practices regarding leaving "evidentiary holds" on vehicles and smartphones works to deny owners whose property is seized for forfeiture as well as "evidence" the constitutionally mandated procedures providing protection for property owners provided in the District's recently amended civil forfeiture statute.

5.      The District's system of over-detaining  vehicles, smartphones and other property places an unbearable burden on the working poor and the other most vulnerable members of our

---

[1] As used herein "smartphones" includes tablets such as iPads.

community and it also fundamentally violates a sense of core fairness regarding property rights. As Alexander Hamilton stated, "[g]overnment is instituted no less for protection of the property, than of the persons, of individuals." The Federalist Papers, No. 54 (Alexander Hamilton or James Madison); *see also Boyd v. United States*, 116 U.S. 616, 627 (1886) ("The great end for which men entered into society was to secure their property.").

## INTRODUCTION

6.     Named Plaintiffs Olivia Parrott, Bardino Joyner, and Dreyvon Iracks bring this class action to challenge the District's and the MPD's policy *in toto* that simply delays releases of property seized in connection with criminal investigations and sometimes civil forfeiture until the system, in its sweet time, and with the resources it chooses is ready to make releases.

7.     The MPD towed away Ms. Parrott's family Volkswagen Passat and the iPhones in the car belonging to her and her two young sons in the dead of night sometime on August 22, 2019 without a warrant or notice to Ms. Parrott but MPD did not return the Passat until September 2021, over two years later, even though Ms. Parrott gave a three hour interview to detectives the morning of the seizure, MPD and DFS had finished searching, processing, and photographing the Passat within a couple weeks, and MPD had arrested a suspect and the prosecutor had instituted a case in Superior Court within four months on November 18, 2019. The MPD never submitted a PD 81-C to the prosecutor for the Passat's release until a few days before its release in September 2021.

8.     MPD still have the keys to the Passat and the family iPhones.

9.     The MPD towed Mr. Joyner's 2018 Toyota Tundra on May 5, 2020 from the lot of the Oak Park Apartments in South East D.C. at night without a warrant or notice to Mr. Joyner and held it for over a year – until June 2021 - without ever bringing a criminal case connected to the

Toyota Tundra. Because the MPD classified the vehicle as "evidence" as well as for forfeiture, and because the constitutionally mandated procedures providing protection for vehicle owners seized for forfeiture determinations such as forfeiture notice and prompt post seizure hearings for return of vehicles pending the ultimate outcome of the forfeiture proceedings do not go into effect until the MPD removes any "evidentiary hold" it has imposed on the vehicle, Mr. Joyner never received forfeiture notice or a prompt post seizure hearing. It took Mr. Joyner months to recover the Toyota Tundra after retaining a lawyer. Because MPD left the "evidentiary hold" on the vehicle after the brief period of time needed to process the vehicle for evidentiary value he was not given a prompt post seizure hearing and the District used possession of the Toyota Tundra as leverage in the negotiations for the return of the Toyota Tundra.

10.     The MPD towed away Mr. Iracks' Infiniti QX50 SUV on October 18, 2021 without a warrant or notice to Mr. Iracks in connection with an alleged shooting and MPD still have it. The vehicle is also subject to forfeiture for transportation of a firearm but Mr. Iracks has never received forfeiture notice or a prompt post seizure hearing because the vehicle is also classified "as evidence." The investigating detective has stated that he will not release the vehicle until Mr. Iracks, amongst other things, submits to an interview about the alleged shooting.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Ms. Parrott's, Mr. Joyner's, and Mr. Iracks' and the other class members' 42 U.S.C. § 1983 claims under 28 U.S.C. §1331 and 28 U.S.C. §1343(3)-(4).

12.     This Court has supplemental jurisdiction over Ms. Parrott's, Mr. Joyner's, and Mr. Iracks' and the other class members' common law claim. See 28 U.S.C. A. § 1367(a).

13.     Venue is proper in this jurisdiction pursuant to 28 U.S.C §1391(b) because the events or omissions underlying the claims occurred in this judicial District.

## PARTIES

14.     Olivia Parrott, Bardino Joyner, and Dreyvon Iracks are adults from whom the MPD seized vehicles and smartphones in connection with criminal investigations and, in the case of Mr. Joyner and Mr. Iracks, also for civil forfeiture.

15.     Defendant District of Columbia is a municipal corporation capable of being sued under D.C. Code § 1-102.

16.     During all events described herein, all police officers and other MPD employees referred to herein, named or unnamed, unless otherwise specified, were police officers or civilian employees of the District of Columbia Metropolitan Police Department acting within the scope of that employment, in furtherance of the interests of the District of Columbia, and under color of the statutes, ordinances, rules, customs, and usage of the District of Columbia.

### Non-party Government Actors

### The Evidence Control Branch

17.     The Evidence Control Branch (sometimes "ECB") is an element within the MPD which stores and manages property seized by the MPD for use in investigations which the MPD classifies as "evidence."

18.     The Evidence Control Branch is not a name that appears in any District of Columbia statute, regulation, or written directive issued by the Chief.

19.     But, the element calls itself the Evidence Control Branch and it has webpage space on the MPD website. https://mpdc.dc.gov/page/evidence-control-branch

20.     The Evidence Control Branch website sets out how the MPD recovers, classifies, and releases property and the regular procedures for the return of property seized or otherwise recovered by the MPD.

### The "United States [A]ttorney for the District of Columbia or [their] assistants"

21.     The United States Attorney for the District of Columbia is not a defendant in this case. But, the "United States [A]ttorney for the District of Columbia or [their] assistants" (the "US Attorney") prosecutes felony cases and most misdemeanor cases under the D.C. Code pursuant to D.C. Code § 23-101(c).

22.      The US Attorney also prosecutes minor cases under the D.C. Code which are normally prosecuted by the OAG if the minor cases are joined with a felony or misdemeanor and if the OAG consents pursuant to D.C. Code § 23-101(d).

23.     Section 23-101 is part of an "Act of Congress applicable exclusively[2] to the District of Columbia," and thus is "considered to be a statute of the District of Columbia" for purposes of § 1983.

24.     The D.C. Code is also an "Act of Congress applicable exclusively to the District of Columbia" which the Congress has given the D.C. Council power to amend (subject to Congressional approval). D.C. Code § 1-206.02(c)(2).

25.     There is no statutory basis for the US Attorney to hold vehicles as possible evidence in in criminal investigations conducted under the D.C. Code or proceedings in the Superior Court.

26.     As the District concedes in its motion to dismiss, D.C. Code § 5-119.06(d) does not apply to property held in connection with criminal investigations (which the District classifies as "evidence" and which is referred to as subject to an "evidentiary hold") unless the property has

---

[2] D.C. Code § 23-101 derives from an Act to Establish a Code of Law for the District of Columbia, ch. 854, § 932-933, 31 Stat. 1189, 1340-41 (1901). The District of Columbia Court Reform and Criminal Procedure Act of 1970, PL91- 358, 84 Stat. 473, 604-605 (1970), created the current version. D.C. Code § 1-204.35(AG elected).

been "feloniously obtained" or is "the proceeds of crime." [ECF No. 15-1], p. 4 n.1.[3] See also District's motion to dismiss in *Cameron v. District of Columbia*, 21-02908 (APM) [ECF No. 19-1], p. 5 n. 3.

### Office of the Attorney General of the District of Columbia ("OAG")

27.    OAG prosecutes minor quality of life offenses and traffic offenses such as DUI under the D.C. Code. D.C. Code § 23-110.

28.    OAG also prosecutes civil forfeitures under the D.C. Code. D.C. Code § 41-302 *et seq.*

29.    There is no statutory basis for the OAG to hold vehicles as possible evidence in criminal proceedings conducted under the D.C. Code in the Superior Court.

30.    Nonetheless, the District allows the OAG unfettered discretion in retaining vehicles seized as possible evidence as long as the OAG likes by not providing prompt post seizure hearings at which owners can compel the return of their vehicles when they are no longer needed as evidence.

### FACTUAL ALLEGATIONS

### The District Seizes Vehicles and Smartphones for Use in Criminal Investigations and then Holds Them long after Extracting Evidentiary Value from Them

31.    The MPD seizes vehicles (which frequently contain other property) and smartphones and cash in connection with criminal investigations and for forfeiture determinations under the District's civil forfeiture statute.

32.    The District does not seizes and retain the vehicles and smartphones and cash to offer them as evidence in hearings or criminal proceedings.

---

[3] The Evidence Control Branch website describes "Suspected Proceeds of a Crime" as "primarily a holding classification for the purpose of investigation" ... [which must be] handled in the same manner as evidence."

33.     The vehicles themselves are virtually never offered as evidence in court proceedings, and smartphones are seldom if ever offered as evidence in court proceedings.

34.     Cash is used in court only when it is stained with blood or has some other independent evidentiary value.

35.     Interviews with experienced criminal law practitioners in Superior Court (one of whom was an Assistant Corporation Counsel in the General Crimes Section (now known as the Criminal Section) for approximately 3 years from 1998 to 2001 and served as Chief of the Criminal Section in the criminal division for 11 months from 2008-2009) show that in over 25 plus years of practice in Superior Court no one has ever seen a vehicle offered as evidence in a court proceeding.

36.     The supervisor in the Evidence Control Branch responsible for vehicles testified in a deposition in 2017 that he had only taken one vehicle to court in the previous thirteen years.

37.     The only justification for the MPD to seize and retain vehicles and smartphones in connection with criminal investigations is to prevent the loss of "potential evidence" in the vehicles and smartphones (items and trace evidence such as fingerprints and DNA in and on vehicles and data and trace evidence in and on smartphones) by searching, processing, and photographing the vehicles and smartphones.

38.     The evidentiary value of any potential evidence that may be found in a vehicle or a smartphone is separate and distinct from the vehicles or the smartphones themselves.

39.     Thus, the evidentiary utility of a vehicle or a smartphone, along with the government's right to keep them, must be analyzed separately from the contents of, or the trace evidence on or in, a vehicle or the data or trace evidence on or in a smartphone.

40.     Searching and processing a vehicle for trace evidence is a process which takes only a couple of days or weeks except in the most exceptional circumstance.

41. The MPD purchased and implemented before April 14, 2015 cell phone investigative kiosks which allow users to extract data from cellphones and smartphones and put it into a report for use by investigators.

42. The vehicles and smartphones themselves typically have no evidentiary value after they have been searched and processed for evidence.

43. Any evidentiary value in the vehicles and smartphones themselves remaining after processing can be preserved by processing the vehicles for trace evidence such as fingerprints and sufficiently informative photographs of the vehicles and smartphones.

44. Then Attorney General Nathan testified in a written statement to the D.C. Council in 2013 regarding the proposed amendments (Bill 20-48) to the District's civil forfeiture statute that the MPD can complete the process of identifying registered owners and lien holders and determining in consultation with the prosecutor whether a vehicle should be kept as evidence taking other steps for notice and prompt post seizure hearings within fourteen business days from the date of seizure.

45. In the same written statement Attorney General Nathan testified that MPD classifies all property it seizes in connection with criminal investigations as "evidence."

### The MPD classifies property and controls the timing of its release

46. The MPD – not the U.S. Attorney or the DC Office of the Attorney General - classifies property it recovers including vehicles and smartphones according to classifications such as "evidence" (for investigation), for civil forfeiture, or "personal property" established by the Chief in MPD Policy Directives. MPD General Order 601.1, Recording, Handling and Disposition of Property Coming into the Custody of the Department, GO-601.01, p. 3, 20 (I, A, 6; III, A)(April 30, 1992).

47. Property classified by the MPD as "evidence" is said to be subject to an "evidentiary hold."

48.     Although, according to its own internal directives, the MPD does not release vehicles or smartphones it classifies as "evidence" without obtaining a statement of no objection to release (an MPD generated form called a PD 81-C required by the MPD policy directives) from the appropriate prosecutor, the MPD – not the U.S. Attorney or the DC Office of the Attorney General - controls the timing of when to submit the release to the appropriate prosecutor.[1]

49.     The U.S. Attorney's Office confirms that the procedure for release of seized property is as follows: the MPD officer "makes the decision to release the seized property," and then presents a Form 81C to a supervisor at the USAO to sign "indicating that the USAO-DC has no objection to that release and that said property is not needed to be retained as evidence." (Giovannelli Decl. ¶¶ 3-7).

50.     If the MPD asks the prosecutor to extend the time to release the vehicle the U.S. Attorney will agree even if the U.S. Attorney has already signed a PD 81-C.

51.     The MPD in practice has no reliable system for making sure that some member promptly obtains a PD 81-C from a prosecutor for vehicles or smartphones or other property when it is no longer needed for evidentiary reasons.

### Taking and Detaining a Vehicle or Currency for a Forfeiture Determination

52.     Taking and detaining a vehicle or currency or personal property for a forfeiture determination means the vehicle, currency, or property is seized so that the District can make a

---

[1] D.C. Code § 23-101 allocates prosecutorial authority between the United States and the District of Columbia. Generally speaking, the U.S. Attorney prosecutes misdemeanors and felonies and the OAG prosecutes traffic offenses and minor offenses and quality of life offenses such as operating without a valid license and panhandling.

determination about whether to proceed with civil forfeiture proceedings against the property even if the District ultimately decides that the property is not subject to civil forfeiture.[5]

53.    The MPD classified each such vehicle or other property on the PD 81 as "H," "hold for civil forfeiture," according to criteria in the MPD general orders.

54.    Property classified by the MPD for forfeiture is said to be subject to a "forfeiture hold."

55.    All property classified as for forfeiture is also classified by the MPD "as evidence" and is said to be subject to an evidentiary hold.

56.    The Asset Forfeiture Unit is the MPD "element" that investigates forfeiture cases to make a written recommendation about whether property should be subject to administrative forfeiture (the first step in forfeiture proceedings) or returned to the owner.

57.    Property seized for forfeiture determinations remains in the custody of "the District" until it is deemed not subject to forfeiture and returned to the owner or it is forfeited or auctioned off or otherwise disposed of. D.C. Code § 41-303(b)(1).

58.    None of the constitutionally mandated procedures providing protection for property owners such forfeiture notice, prompt post seizure hearings for return of vehicles pending the ultimate outcome of the forfeiture proceedings, and timely hearings go into effect until the MPD removes or "lifts" any evidentiary hold it has imposed on the vehicle, currency, or other property.

---

[5] The term "forfeiture determinations" is used instead "for forfeiture" because sometimes the District determines that property seized for forfeiture is in fact not subject to forfeiture. Property that is not subject to forfeiture must be returned to the owner. The four distinct types of property subject to forfeiture under the District's civil forfeiture statute are: real property, vehicles, currency, and other personal property. D.C. Code § 41-301(1). Forfeitable offenses, the offenses that can give rise to civil forfeiture, include: § 7-2507.06a (illegal transporting a firearm); § 8-905 (illegal dumping); § 22-902 (trademark counterfeiting); § 22-1705 (gambling); § 22-2723 (prostitution); § 48-905.02 (controlled substances); § 50-1501.04 (operating improperly registered vehicle), or § 50-2201.04b (operating  vehicle without a valid licenses). The OAG prosecutes forfeiture actions according to the procedures set forth in D.C. Code § 41-301 *et seq.*

59.     The USAO does not have suspected controlled substances analyzed in misdemeanor cases unless the case goes to trial even in the event of a plea.

60.     The OAG does not have suspected controlled substances analyzed unless a civil forfeiture goes to trial.

61.     Prior to releasing property subject to a forfeiture hold the MPD obtains a forfeiture PD 81-C from the OAG.

### The District has a policy and practice of keeping the property long after it is needed to extract evidentiary value and other purposes.

62.     The District retains the vehicles or smartphones pursuant to the District's policy of retaining "potentially discoverable material" until the case is over or, if no judicial case is filed, for a period of three years from the date such material was first obtained. [6]

63.     The website of the Evidence Control Branch advises owners in the section explaining the regular procedures for the return of property classified as "evidence" that "[t]his property is generally held until the conclusion of any pending court action."[7]

64.     Additionally, the District and the MPD treat the Property Clerk statute as though it allows the District to keep all vehicles and smartphones seized in connection with criminal investigations

---

[6] MPD policy as expressed in two General Orders. "The policy of the Metropolitan Police Department is to preserve all material, which may constitute evidence, or may otherwise be pertinent in a subsequent criminal judicial proceeding." MPD General Order 601.2 "Preservation of Potentially Discoverable Material" (Feb. 3, 2004) at Part II. "Policy." Under the MPD's General Order, "potentially discoverable material" is defined to "include[], but is not necessarily limited to, such items as tangible documents, reports, video/audio tapes, transcripts of video/audio tapes, and photographs." Id. at Part III. "Definitions" (emphasis added). Potentially discoverable evidence is to be preserved "until the entire investigative jacket or case folder is disposed of," or, "[i]f no criminal judicial proceeding has been initiated, the material shall be preserved for a period of three years from the date such material was first obtained." Id. at Part V.B (1) & (2).

[7]   https://mpdc.dc.gov/page/evidence-control-branch

for up to a year even though, as the District concedes in its motion to dismiss, [ECF No.15, 15-1], it does not apply to property typically seized as "evidence." D.C. Code § 5-119.06(d).

65.     The District and the MPD's policies and practices of seizing and retaining vehicles, smartphones, and other property for use in criminal investigations and then holding such property long after it has any evidentiary value result from District and MPD agents misusing the power they possess under color of District of Columbia law according to established District procedure.

66.     The entrenched nature of the District's system and wholesale embrace of the system by District of Columbia policymakers as standard District procedure is evidenced by the District's vigorous defense of the system in the District's motion to dismiss the original complaint. [ECF No.15, 15-1]

67.     The MPD's retention policy is a moving force in delay in returning property to owners after a reasonable period for processing the property for evidence even when property is returned before a case is over because the MPD's retention policy saps the MPD of any sense of urgency in processing vehicles and smartphones and other property for evidentiary value and then returning it to owners.

68.     The MPD believes that as long as it returns property before or at the end of any trial or case it has discharged its obligation to respect owners' property rights and it has not overdetained the vehicles and smartphones because its "investigations" lasts until the case is over.

69.     The MPD's interpretation of District statutes and its own policy directives is that it is entitled to keep vehicles, smartphones, and other property seized in connection with a criminal investigation until the end of "the investigation," and the MPD's conception of a criminal investigation includes not only processing property for whatever "potential evidence" it might yield

but also interviewing witnesses, having witnesses testify a grand jury, instituting and prosecuting a criminal case on the off chance that it might require further searches of property.

70.     Instead of providing notice to owners or drivers, the MPD sits back and waits for owners to track down their vehicles and smartphones at the local MPD station and beg police for the return of their vehicles and smartphones.

71.     The MPD controls virtually every step of the process and enjoys a monopoly on the details of why the MPD seized the vehicles and why the MPD retains the vehicles.

72.     The MPD's system puts the burdens on the owners of tracking the vehicles and keeping up with the progress of the MPD investigation until Rule 41(g) becomes available to owners aggrieved by deprivations of their property.

73.     A major problem with the District's policy and practice of over-detaining vehicles and smartphones by holding vehicles and smartphones and other property long past the time they are needed to recover "potential evidence" is that the policy and practice deprives owners of their possessory interests in their property, and the property wastes away during the illegal detention while owners must pay to title, register, and maintain it.

74.     Prompt return of vehicles and smart smartphones to owners after the MPD no longer needs them is critical because: (1) vehicles and smartphones play a crucial role in modern day life; (2) they are wasting assets which can lose value or even their entire worth if not promptly returned; and (3) owners still have to pay car notes and registration and insurance and phone plans even while the MPD has their property.

75.     Frequently owners must replace their vehicles and smartphones by buying new ones.

76.     The consequences of over-detaining a family or business vehicle or smartphone for the owner can be severe, potentially imperiling their job, their source of income, and even their family relationships.

### The MPD has no system of prompt review and processing so that vehicles and smartphones can be promptly returned to owners

77.     The MPD lacks written policies for facilitating prompt review and processing of property classified as "evidence" so that vehicles and smartphones can be promptly returned to owners.

78.     There is no statute or MPD policy statement guiding seizing officers or investigators on the types of testing that should be performed on vehicles depending on the type of offense for which it is held.

79.     MPD members simply do not process property or each member follows their own preferences.

80.     Exacerbating the delay is the MPD's paper driven property management system which itself causes delay and makes it impossible for members, investigators, and supervisors to manage property and oversee property to make sure it is searched and processed and preserved and promptly returned when no longer needed.

81.     MPD has no workable system for tracking property seized in connection with criminal investigations to ensure that the property has been searched and processed, preserved, and returned to owners. See PCB POLICY REPORT #19-4: Handling Property.

82.     Like the DOC, which used a paper driven system to record commitments and release dates and release orders of inmates, the MPD use a paper driven system of Property Books and police forms such as the PD 81 for recording property coming into the possession of the MPD, including property seized in connection with a criminal investigation.

83.    The General Order provides a paper driven system for giving every item its own paper trail, in the form of a Property Book at each "element" or station, and a PD Form 81, to record the seizure of the item, the classification of the item, describe the item, and the chain of custody that the item travels through during its time in police custody.

84.    Typically the PD 81 records the name and contact information of the person from whom property was seized, or the suspect in the case, but not the name and contact number of the owner where different.

85.    "The outdated use of a paper property log book is ripe for errors and carelessness, and can be cumbersome to use." PCB POLICY REPORT #19-4: Handling Property, p. 7.

86.    Numerous police departments have adopted electronic systems for tracking property, unlike MPD which still uses a paper log book at each district station to track property.

87.    An integrated department wide electronic system would allow anyone in the department such as the Chief and supervisors to view property contained in an electronic record within the software. PCB POLICY REPORT #19-4: Handling Property, p. 7.

88.    Using electronic property management enables department personnel to know where property is and why it is being held, from any location within the department, giving greater access to information and increased accountability and control, as well as great responsiveness to community members.

89.    So, MPD is not able to employ real-time tracking of property, has no ability to set retention status on property for efficient review of evidence, generating reports and forms, and easy queries.

90.    Members do not systematically log property into the MPD' property control software, EvidenceOnQue.

91.     Nor do MPD update the name of owners (as opposed to persons from whom property is seized such as arrestees) in EvidenceOnQue, the MPD's property database.

92.     In a recently settled class action involving vehicles classified as civil forfeiture and in many cases also as evidence, the District seized vehicles from drivers and in about 90% of the cases the drivers were not the owners.

93.     But, EvidenceOnQue, the property database did not accurately record the owner of the vehicle as opposed to the driver from whom it was seized because MPD members never obtained the data or never entered it into EvidenceOnQue if they did.

94.     The data in EvidenceOnQue provided to the claims administrator in a recent class action was so unreliable that the claims administrators' fee had to be tripled and Class Counsel and the data analysis firm retained by Class Counsel had to spend hours matching up claims with PDF versions of MPD documents to identify owners.

95.     As a result, MPD seizing officers and investigators have no easy way of monitoring property and whether it has been searched, processed or photographed and whether it is ready to be returned to owners.

96.     As a result, sometimes the investigator for whom property has been seized even forgets they have property or lose track of it.

97.     Supervisors and policymakers in the MPD have no reliable and accurate way of monitoring property and whether it has been searched, processed or photographed and whether it is ready to be returned to owners.

98.     For example, the MPD do not use EvidenceOnQue to track information about PD 81-Cs such as who is the officer responsible for requesting the form, when it is presented to the

prosecutor, and when or if it was returned by the prosecutor to the MPD even though EvidenceOnQue could be programmed to perform those functions.

### The MPD does not provide notice or an inventory of property seized at or promptly after seizure for property the MPD classifies as "evidence"

99.     The MPD does not provide notice or an inventory of property seized at or promptly after seizure for property which the MPD classifies "as evidence."

100.    No statute, rule, regulation or order provides for written notice and an inventory of property which the MPD classifies as "evidence."

101.    Instead, the MPD sits back and waits for owners to track down their vehicles at the local MPD station and then beg police for the return of their vehicles and smartphones.

102.    It is difficult and time-consuming for owners to try to locate their vehicles and smartphones, determine why they were taken, and figure out how to get them back.

103.    The MPD does not provide any written notice or an inventory of property seized as "evidence" at or promptly after the time of seizure, not even a property receipt, telling owners or drivers which one of the several possible grounds it is seizing the property for – investigation/ evidence, or forfeiture determinations.

104.    Nor do MPD officers give persons from whom it seizes vehicles or smartphones for investigation or as evidence any written notice with contact information such as a working phone number or a CCN number (MPD incident number) or an Evidence Control Branch "property control or identification number" or barcode number so people can call the MPD or ECB about the status and location of their vehicles and how to retrieve them.

105.    The MPD seizes practically all vehicles and smartphones it classifies as "evidence" in warrantless seizures so there is no return listing an inventory of property taken.

106.    Even when the MPD seizes vehicles or smartphones pursuant to a warrant the MPD virtually never provide owners whose vehicles or smartphones are seized pursuant to a warrant with a copy of the warrant or a return or inventory of property taken as the Constitution and Rule 41(g)(f)(6) requires. (sometimes D.C. SCR-Crim. Rule 41)

107.    In many cases the MPD simply has vehicles towed away without even notifying the owner.

108.    As a result, owners do not know who has legal custody of their vehicles and so they cannot tell which recovery procedures apply (because different recovery procedures apply depending on which agency has legal custody of the vehicle or why the property was taken).

109.    Besides not providing notice at seizure, seizing officers often provide misleading information, such as telling owners they do not have their vehicles when they in fact do, or that they will never get their property back.

110.    As a result of not receiving notice at seizure, owners must run all over town and bounce from office to office and from agency to agency trying to locate who has seized their vehicles and why.

111.    Most owners get a big run-around from the station or the Evidence Control Branch when they call or visit to learn who has their property and why.

112.    MPD general orders require the seizing officer to complete a "PD 81," a police form describing the property and the reason for its seizure (e.g., investigation, civil forfeiture), within 24 hours of the seizure. The PD 81is typically completed before the seizing officer completes their shift.

113.    However, the MPD do not give a copy of the PD 81 to the owner or driver (if different from the owner) of the seized vehicle until discovery is provided to the driver (who is in most cases not the owner) in the criminal case -- if a prosecution is instituted at all.

114.    If a criminal case is not initiated then the owner cannot access the PD 81 until discovery in the civil forfeiture case.

115.    MPD do not provide notice to owners of property seized for forfeiture which is also classified "as evidence," because the civil forfeiture statute provides that the District does not have to provide forfeiture notice until any "evidentiary hold" is lifted.

116.    The District and the MPD lacks regular procedures for the return of property and remedies to pursue if property is not returned according to those regular procedures.

117.    The MPD posts the procedures for recovering property depending on the MPD classification (e.g., prisoner's personal property, property classified as "evidence") on the area of its website reserved for an entity it calls the "Evidence Control Branch."

118.    The District has a practice of not providing notice at or near seizure or when the District no longer needs a vehicle.

119.    Instead, the District expects owners to keep calling about their vehicles and smartphones until the District has some news to tell them about retrieving their vehicles.

120.    The Superior Court Clerk's Office does not provide information about warrants unless the warrants are docketed which does not include warrants for vehicles.

121.    Similarly, neither the District nor the MPD provides notice to owners when criminal proceedings relating to their property are filed and Rule 41(g) motions become available to them.

122.    Owners are expected to monitor the progress of an MPD investigation until MPD members inform them when they are ready to release their vehicles or a case is filed.

123.    Neither the District nor the MPD provides notice to owners when their property seized in connection with a criminal investigation is no longer needed by the MPD and it is available for pick up.

124.    The notice is necessary to inform plaintiffs promptly when their property is ready so they do not have to keep beating their heads against the wall contacting MPD or Evidence Control Branch trying to find out when their property is ready for release.

### The District's system for "evidentiary holds" and civil forfeiture funnels owners into dealing with investigators instead of providing them with a prompt post seizure hearing.

125.    The District's system for "evidentiary holds" and civil forfeiture funnels owners into dealing with investigators instead of providing them with a prompt post seizure hearing when a vehicle is classified as "evidence".

126.    MPD policy statements require officers seizing a vehicle as "evidence" to enter the property in the Property Book, a paper book kept at each station.

127.    Officers and investigators make an entry into the Property Book asking to be contacted if someone calls or visits the station asking about the property.

128.    People calling the local MPD station to inquire after their vehicles and smartphones are told to call seizing officers or investigators.

129.    The seizing officers' and investigators' interest is in collecting information from owners and using the vehicles and smartphones as leverage to force statements.

130.    Investigators control how long MPD retains vehicles and smartphones because the investigator assigned to the case controls when to submit a PD 81-C "no objection" form to the prosecutor.

131.    The investigators have a custom and practice of conditioning return of a vehicle on owners' giving interviews or testifying before a grand jury otherwise cooperating in an investigation.

132.    Typically the seizing officer or investigator will not provide the owner or driver with a property control number or a CCN number.

133.    In a classic catch 22, the Evidence Control Branch will not state whether it has vehicles, or wide, until the owner can provide a property control number. An owner cannot obtain an incident report without a CCN number.

134.    Seizing officers and investigators interpret their mandate to allow them to keep vehicles and smartphones until a case is over or indefinitely if no case is filed in Superior Court.

### The MPD lacks any statutes, policies, or training on how to balance the District's Rule 16 preservation obligations with owners' rights to prompt return of their vehicles and smartphones and other property

135.    The MPD lacks any statutes, policies, or training on how to balance the District's Rule 16 preservation obligations with owners' rights to prompt return of their vehicles and smartphones and other property.

136.    The Fourth Amendment requires balancing the District's Rule 16(a)(1)(E) preservation obligations with owners' rights to prompt return of their vehicles and smartphones and other property.

137.    The MPD has no statutes, rules, orders or training to guide members in preserving the evidentiary value of vehicles and smartphones for defendants so the MPD just retains them for inspection by defendants even when simply searching, processing and photographing a vehicle or creating a mirror image of data on a smartphone would satisfy the MPD's preservation obligations.

138.    As far back as 1998 the District of Columbia Court of Appeals warned the MPD and the District in a written opinion that the District lacks a statute specifying the portions of a vehicle which (e.g., VIN, VIN in place, ignition, inside and outside of vehicle) should be photographed in lieu of retaining a vehicle such as the statutes in other big cities. *Cf.* New York Penal Law § 450.10 (4)(c) (McKinney 1997 Supp.).

139.    The chief has never promulgated any written directives such as general orders or instituted any training specifying what steps members may take to satisfy their preservation obligation such as specifying what type of property should be kept, criteria for releasing property after processing,

140.    The MPD policies and procedures have dedicated rules to facilitate the prompt return of stolen vehicles to owners but the MPD does not have similar rules for the return of other property once the vehicle or smartphone has been processed for evidentiary value.

141.    In fact, recovered stolen vehicles are towed by licensed private tow cranes and stored at their respective impoundment lots instead of at the Evidence Control Branch.

**The MPD practice of leaving "evidentiary holds" on vehicles and smartphones until a case is over or long after extracting evidentiary value from property prevents the constitutionally mandated procedural protections in the civil forfeiture statute from activating**

142.    Because the MPD classifies property (whether as evidence or for forfeiture or some other classification) coming into its possession, and when to seek a PD 81-C (certificate of no objection to release) from the prosecutor, the MPD controls how property is classified and when it is released.

143.    The MPD practice of leaving "evidentiary holds" on vehicles and smartphones until a case is over or long after extracting evidentiary value from property prevents the constitutionally mandated procedural protections in the civil forfeiture statute from activating.

144.    The MPD practice of leaving "evidentiary holds" on vehicles and smartphones has the effect of denying owners whose vehicles and money are seized for forfeiture as well as "evidence" the constitutionally mandated procedural protections in the District's amended civil forfeiture.

145.    Because none of the constitutionally mandated procedural protections in the District's amended civil forfeiture statute kick in until after the MPD removes their classification of the

vehicle "as evidence," D.C. Code § 41-302(d), MPD effectively denies owners the constitutionally mandated procedural protections such as notice and in the case of vehicles the right to prompt post seizure hearings by not seeking PD 81-Cs for a vehicle until after it is ready to release any "forfeiture hold" on vehicle seized for forfeiture.

146.    Before the 2015 Amendments the Mayor, the Property Clerk and the MPD manipulated the timing of requests for PD 81-Cs to extend the time that property is classified as "evidence" so that the MPD can take its time about conducting investigations under the guise of forfeiture investigations, sending forfeiture notice and initiating forfeiture, and for other MPD reasons.

147.    The MPD did not submit PD 81-Cs to prosecutors until after receiving PD 81-Cs from the forfeiture branch of the OAG to support its theory that "evidentiary holds" imposed by the USAO (according to the District) rather than forfeiture holds caused by the Mayor and the Property Clerk were the cause of extended retentions of vehicles without prompt post seizure hearings.

148.    The MPD continues the practice of timing of the requests for PD 81-Cs to keep the vehicle classified as "evidence" until after the Asset Forfeiture Unit has completed its investigation of the forfeiture based on the District of Columbia civil forfeiture statute which provides that notice, prompt post seizure hearings and other constitutionally mandated protections are not available to owners until "evidentiary holds" are removed.

149.    Without the constitutionally mandated protections owners whose vehicles are seized for civil forfeiture have no option except to "ransom" their vehicles from the MPD by paying a higher settlement than they would if they had possession of their vehicle pending the outcome of the forfeiture proceedings or hire lawyers at great expense to secure their return.

150.    It was wholly obvious the effect of the MPD's practices of leaving "evidentiary holds" on vehicles and smartphones until a case is over or long after extracting evidentiary value from

property would deny the constitutionally mandated protections to owners whose vehicles are seized for civil forfeiture as well as classified as "evidence" because the MPD policy and practice is to classify all vehicles seized for forfeiture determinations as "evidence" as well as for forfeiture.

### The District does not Maintain Regular Procedures for the Return of Property or Remedies to Pursue if Property is not Returned according to those Regular Procedures

151.    Due process requires that the District, having taken the property of arrestees and others without a warrant and having retained it until the conclusion of criminal proceedings, or for longer than needed to extract evidentiary value from the property, has a procedure for the prompt return of that property that comports with due process such as a procedure through which owners can promptly seek the return of their wasting property before a neutral decision maker.

152.    But, neither the District nor the MPD maintains regular procedures for the return of property which the MPD classifies as "evidence" or publicly available constitutionally adequate remedies to pursue if property is not returned according to regular procedures.

153.    The District's regular procedures for the return of property seized in connection with criminal investigations and classified as "evidence" to the extent they exist are arcane and inadequate.

154.    The District's regular procedures for the return of property seized in connection with criminal investigations and classified as "evidence" to the extent they exist are posted on the part of the MPD website allocated to the Evidence Control Branch:

> Evidence: This property is generally held until the conclusion of any pending court action. Subsequently, the prosecuting attorney will initiate a "Property Release" certifying that the property is no longer needed for court and may be returned to the rightful owner.

> Suspected Proceeds of a Crime: This is primarily a holding classification for the purpose of investigation. At the end of a sixty-day period, the classification must be

changed or the property released. Property retained after this time is handled in the same manner as evidence.

https://mpdc.dc.gov/page/evidence-control-branch (in relevant part)

155.    The District failed to canalize the exercise of official power regarding seizure and retention of vehicles, smartphones and other property the MPD classified as "evidence" with adequate procedural safeguards for the regular return of property when the MPD no longer needed it.

156.    The deficiencies in the PD 81-C process exacerbate the lack of regular procedures for the return of property which the MPD classifies as "evidence": MPD policy statements require MPD members to obtain PD 81-Cs from the relevant prosecutors before returning property which the MPD classifies "as evidence," but in practice members do not obtain the PD 81-Cs, delay obtaining them for reasons such as forcing owners to submit to interrogations or denying constitutionally mandated procedural protections to owners whose property was seized for forfeiture as well as "as evidence."

157.    The MPD maintains a paper driven system for recording and tacking vehicles and other property so supervisors have no meaningful ability to monitor property and ensure PD 81-Cs are promptly submitted to prosecutors, so supervisors have no meaningful ability to monitor property and ensure that it is promptly returned to owners when no longer needed.

158.    Rule 41(g) does not provide prompt, adequate post deprivation remedies to pursue if property is not returned according to the MPD regular procedures.

159.    Rule 41(g) motions are available only in a limited range of investigations where a criminal case has been instituted in Superior Court by a prosecutor. If a prosecution has not been instituted or is never instituted because an arrest is no-papered then there is no case in which an owner can file a Rule 41(g) motion.

160.    Rule 41(g) is not available until a criminal case is instituted.

161.    There is no D.C. Code provision, D.C. Superior Court Rules of Criminal or Civil Procedure, or other applicable court rules enabling an owner to file a Rule 41(g) motion in Superior Court until a case is instituted relating to the property.

162.    The Superior Court has no publically available procedure for filing Rule 41(g) motions for return of property until a before a criminal case is instituted. There is no D.C. Code provision or rule of court informing owners or court personnel how to file Rule 41(g) motions for return of property until a criminal case is instituted.

163.    The Clerk and staff in the Clerk's Office have no procedure for allowing owners and other aggrieved persons to file Rule 41(g) motions before a case relating to property is instituted or when an arrest is no-papered.

164.    Even when a case has been initiated the owner may not bring a Rule 41(g) motion until, at the earliest, at least 20 days after a prosecution has been initiated.

165.    Moreover, judicial officers in both the District Court and the Superior Court have a practice of not entertaining Rule 41(g) motions until they ascertain whether the District intends to institute civil forfeiture proceedings against the vehicle, currency or other property.

166.    Rule 41(g) is not available if a criminal prosecution involving a vehicle or other property is never instituted because the case is "no papered," that is, the prosecution declines to initiate a case.

167.    The MPD's seizure and retention of Mr. Shakur's vehicle because, police alleged, his daughter drove it from the scene of a misdemeanor assault, illustrates the difficulties in trying to file a motion for return of property before a criminal prosecution is instituted.

168.    Mr. Shakur retained counsel who on December 23, 2020 filed an emergency motion for return of property in the Superior Court with the D.C. Superior Court Judge-in-Chambers.

Amended Class Action Complaint • *Parrott v. Government of the District of Columbia*

169.    Mr. Shakur's counsel has been practicing criminal law in Superior Court for about 25 years.

170.    Mr. Shakur's counsel was an Assistant Corporation Counsel in the General Crimes Section (now known as the Criminal Section) for approximately 3 years from 1998 to 2001.  He served as Chief of the Criminal Section in the criminal division for 11 months from 2008-2009.

171.    Mr. Shakur's counsel stated that the most time consuming and difficult aspect of filing and prosecuting the motion for return of property was finding a clerk in the Criminal Clerk's Office who would allow the motion to be filed because no criminal case had been instituted.

172.    Mr. Shakur's counsel on December 23, 2020 did manage to file an emergency motion for return of property in the Superior Court.

173.    About two weeks later, in an order dated January 5, 2021, the Chief Judge of the Criminal Division of the Superior Court denied the motion without prejudice ruling that "[since] no search warrant has been issued, nor has any criminal prosecution been initiated in connection with the purported seizure of the vehicle, thus it appears that the Criminal Division is without authority or jurisdiction to act upon the request for return of property, absent some additional authority cited on behalf of Mr. Abdus-Shakur." (copy of order attached to the foot of the complaint)

174.    The Chief Judge also noted in the order that, "[t]he Court is forwarding a copy of the Motion to Ms. Lauren Bates, the Chief of the General Crimes Section of the DC Superior Court, as she may be able to provide further assistance."

175.    Retaining counsel of the caliber of Mr. Shakur's counsel is an expensive undertaking.

176.    The experience of protestors in the Cameron protest illustrate the difficulties in trying to file a motion for return of property after a case has been no-papered (the prosecutor declines to prosecute the offense).

177.    The experiences of a group of protestors illustrates the difficulties of retrieving property seized in connection with an arrest that is no-papered even when the owner is advised by public interest groups and large law firms. *See Cameron v. D.C.*, 21-02908 (APM), Complaint [ECF No. 1].

178.    On August 13, 2020, **MPD** arrested approximately 40 protestors as they marched through the Adams Morgan neighborhood of Washington, D.C.

179.    In connection with their arrests **MPD** seized their cell phones and other property.

180.    All but a few of the cases were no papered.

181.    Efforts of the protestors to obtain the return of their phones after their cases were no-papered illustrate the difficulties persons encounter even when they are advised *pro bono* by public interest groups (American Civil Liberties Union Foundation of the District of Columbia , Washington Lawyers' Committee for Civil Rights & Urban Affairs) and a major law firm (Skadden) as the protestors were.

182.    Most persons whose smartphones are seized in connection with an arrest that is no-papered have no representation at all when they try to obtain the return of their smartphones because the CJA program in Superior Court does not compensate CJA lawyers for assisting owners to obtain the return of their property when the arrest in no-papered.

183.    Four days after the protestors' cases were no-papered counsel for the protestors emailed an Assistant United States Attorney ("AUSA") asking for the return of the smartphones and the other property.

184.    The AUSA referred counsel for the protestors to an MPD employee, Vera Worsley, stating that the USAO did not handle the release of property seized by MPD during a "no-papered" arrest.

185.    As counsel for the protestors continued to contact various MPD members for the return of the smartphones and other property he was told by an MPD detective that MPD was considering obtaining search warrants for the smartphones.

186.    In the many months after their cases were "no-papered," the owners made numerous calls to MPD's Evidence Control Division and to MPD property clerks at the Second, Third, Fifth, and Seventh Precincts seeking release of their phones but without success.

187.    Finally, on February 25, 2021, three protestors filed motions in D.C. Superior Court under D.C. Rule of Criminal Procedure 41(g), seeking the return of their property.

188.    Counsel for the protestors filed Rule 41(g) motions in cases of some protestors whose cases had been papered but a deputy clerk of Superior Court informed counsel for the protestors that the presiding judge had declined to entertain the motions.

189.    The Deputy Clerk informed counsel for the protestors that the motions would need to be re-filed under a different caption, and would each be considered as a sealed, standalone noncriminal case for administrative purposes.

190.    According to the complaint in *Cameron*:

> The steps described by Deputy Clerk Jimenez were apparently an *ad hoc* effort by the D.C. Superior Court's Criminal Division to address a situation where, as here, an individual is seeking the return of seized property, but has been no-papered, has not been charged with a crime, and has no connection to an ongoing criminal case. Undersigned counsel have been unable to identify any publicly available rule or authority that sets out the steps described by Deputy Clerk Jimenez in the D.C. Code, the D.C. Superior Court Rules of Criminal or Civil Procedure, or other applicable court rules.

Complaint [ECF No. 1], ¶ 35.

191.    The Superior Court has never established such a filing procedure for other property owners wishing to file Rule 41(g) motions before a prosecution relating to their property is instituted or after an arrest has been no-papered.

192.    Even when a Rule 41(g) motion is accepted for filing in an ongoing criminal case it does not provide a prompt post seizure hearing that meets constitutional requirements because: (1) it is not prompt because it takes too long to be ruled on; (2) the Rule inverts the burden of proof required by the constitution because instead of requiring the District or the MPD to establish a need for the property it requires the owner to establish that the government does not need the property; and (3) the Rule inverts the burden of proof required by the constitution because instead of requiring the District or the MPD to establish a connection between the property and any criminal prosecution or investigation it requires the owner to establish that there is no connection between the property and any criminal prosecution or investigation.

193.    The remedy provided by Rule 41(g) is based on a rule of court, the court's ability to act is circumscribed by the limitations of its ancillary jurisdiction, and that jurisdiction limited to cases involving a filed case or warrant, and owners have no meaningful access to the rule because there are no publically available procedures on how to invoke Rule 41(g) when a case is not pending, and even when a case is pending access is limited to lawyers familiar with the construction of the rule and unwritten local practice.

194.    Once the District initiates civil forfeiture proceedings by classifying the vehicle as held for forfeiture or conducting a forfeiture determination Rule 41(g) is no longer available to an owner or any other aggrieved person.

195.    The prompt post seizure hearings for vehicles provided for in the amended civil forfeiture statute do not become available until after the District lifts any evidentiary holds on the vehicles. D.C. Code § 41-306(a).

196.    The Superior Court's adopted and implemented Rule 41(g) pursuant to its administrative powers and thus it is a policy of the District of Columbia.

**Facts Relating To Plaintiffs' Claims**

**The MPD seized Ms. Parrott's Volkswagen Passat and smartphones belonging to her and her two young sons**

197.     Ms. Parrott is a single mom raising two young sons, ages 7 and 11 in the Parkland neighborhood.

198.     The MPD seized Ms. Parrott's 2013 Volkswagen Passat on about August 22, 2019, and held it for 20 months until September 8, 2021– over two years – in connection with a shooting even though the MPD had completed processing the crime scene and processing and searching and photographing the Passat in only a few days, and even though the MPD had arrested the only suspect (who was caught on CCTV during the shooting) on November 18, 2019, just four months later, and even though the District's prosecutor had instituted a criminal case (2019 CF1 014711) in Superior Court the next day on November 19, 2019.

199.     During that almost two year long period the whole family - Ms. Parrott and her two young sons - were deprived of access to the family car they needed to conduct their lives.

200.     To add insult to injury, when the District finally did return the Passat they returned the car but kept the keys so Ms. Parrott had to pay a tow company to tow it home.

201.     The MPD still has the family's three iPhones.

202.     In the interim while MPD kept the car Ms. Parrott had to buy a replacement vehicle and replacement iPhones.

203.     The MPD seized the Volkswagen Passat in connection with a shooting that happened on about August 22, 2019 in front of Ms. Parrott's home at 1408 18th Place, S.E. and a suspected related shooting which happened earlier close by in the 1700 block of Trenton Place, Southeast.

204.     On about August 22, 2019 police responding to multiple 911 calls found decedent Robert Jerome Brown, Jr. lying in the street near a pool of blood.[8]

205.     Other police responding to a call about a nearby shooting believed by the police to be related found Melvin Simmons seriously wounded in front of Ms. Parrott's home. Mr. Simmons was shot in the back.

206.     MPD believe Mr. Simmons and Mr. Brown were in a gun battle.

207.     It is not clear who was the aggressor or whether Mr. Simmons was acting in self-defense.

208.     Ms. Parrott was in her home when she heard shots about 11 p.m. on the evening of August 22, 2019.

209.     She went outside and "the whole neighborhood" was out there.

210.     Ms. Parrott's Volkswagen Passat was parked there in front of the house where she had left it that afternoon.

211.     She did not have keys to car so could not open it.

212.     Police processed the scene and they found Ms. Parrott's Volkswagen Passat with bullet holes in the back of the car, and with suspected blood in and on the car and nearby on the ground.

213.     The position of the Passat relative to the suspected trajectory of bullet marks, CCTV images, and witness statements led the District to believe the Passat had been moved from the Brown shooting scene.

214.     Police found several items in front of 1408 18th Place, S.E. including guns, a set of keys with a Volkswagen key in the parking, and suspected blood in the area.

---

[8] The description of the scene and what the police found is taken from an MPD police report filed as the *Gerstein* in both of Mr. Simmons's cases, 2019 CF1 014711 and 2020 CF1 004364. The report presents the District's version of events. Ms. Parrott is not adopting the veracity of the contents of the reports.

215.    The DFS processed the scenes and other items found there including the Passat.

216.    The next morning Ms. Parrott went out at about 7:00 a.m. and her Passat was not there.

217.    She used an "app" on her iPhone to search for an iPhone she had left in her Passat.

218.    The app showed the location of the car was at "D.C. Forensics" or DFS.

219.    Ms. Parrott went to DFS to see about her car.

220.    After Ms. Parrott identified the Passat and herself as the owner MPD police put Ms. Parrott in a room there and interrogated her for two to three hours about the Passat, her relationship with Mr. Simmons, and the shootings of Mr. Burke and Mr. Simmons.

221.    Police told Ms. Parrott they would return her iPhone if she told them the password and let them look at it; she did but they still would not give the phone back

222.    MPD told Ms. Parrott they would return the Passat if she cooperated and consented to the search of the Passat.

223.    Ms. Parrott also consented to a search of her Passat.

224.    MPD showed Ms. Parrott video of Melvin Simmons and a woman and MPD were convinced she was the woman in the video.

225.    Ms. Parrott has dreads and that woman in the video had straight hair

226.    MPD asked Ms. Parrott if she were that woman, where was Melvin Simmons, etc.

227.    Ms. Parrott did not know where Melvin Simmons was

228.    Ms. Parrott told MPD she was the "significant other" of Mr. Simmons and the owner of the Volkswagen Passat.

229.    Ms. Parrott is the owner of the Passat although the car is registered in her mother's name. She paid for the car and maintained it.

230.   Ms. Parrott told MPD that Mr. Simmons also sometimes drove the Passat with Ms. Parrott's consent but she had no knowledge of any criminal activity on his part.

231.   Ms. Parrott gave the MPD consent to search the Passat.

232.   Ms. Parrott also gave the MPD written consent to search an iPhone and provided the password.

233.   She did not know where Melvin Simmons was.

234.   Apparently Mr. Simmons had been found at the scene and taken to a hospital in PG County.

235.   MPD told Ms. Parrott they were keeping the Passat in connection with their investigation.

236.   Ms. Parrott asked the MPD when she could get the Passat back and MPD told Ms. Parrott it would be a long time before she got her car back because she was not cooperating.

237.   But, Ms. Parrott answered the officers' questions as best she could but she had no knowledge of either of the shootings and so she could not provide the MPD with any details.

238.   DFS found suspected blood outside and under the Passat believed by DFS to have come from the decedent Mr. Brown and DFS took swab samples of the suspected blood.

239.   The shootings in whole or part were observed by numerous witnesses who called 911 that night or later contacted police.

240.   The shootings in whole or part were captured on Closed Caption Television ("CCTV").

241.   DFS and MPD finished processing (including taking swabs of the suspected blood) and searching the Passat and the iPhones in just a few days.

242.   Alternatively, the DFS and the MPD could have processed the iPhones for evidence such as fingerprints and trace evidence in just a few days.

243.    The DFS and the MPD could have taken a mirror image of the data on the iPhones or had some person or company do that for them in just a few days.

244.    The MPD obtained an arrest warrant for Mr. Simmons on 10/30/2019.

245.    The MPD arrested Mr. Simmons on November 18, 2019.

246.    The AUSA instituted a case against Mr. Simmons on November 19, 2019, 2019 CF1 014711.

247.    Ms. Parrott repeatedly called and called and texted various persons in the MPD connected with the investigation including a detective she spoke to in front of her house to find out when and how she could retrieve her vehicle.

248.    On July 26, 2921 the District's lead detective and the AUSA assigned to the case promised the court-appointed lawyer appointed to represent Ms. Parrott in her grand jury appearance to get back to him within a week about getting her car and property back to her.

249.    Ms. Parrott did not participate in Mr. Simmons' activities or know about them and she complied with a grand jury subpoena.

250.    On June 23, 2021 Ms. Parrott testified before the grand jury.

251.    But, Ms. Parrott was not allowed to pick up her vehicle until September 8, 2021.

252.    On September 8, 2021 Ms. Parrott went to the Blue Plains impound lot to pick up her car believing that she would be able to drive it home.

253.    When Ms. Parrott arrived at the MPD lot where the vehicle was located she didn't have the keys because Mr. Simmons had dropped the keys and the MPD had the keys in their custody.

254.    The MPD did not return the car keys -- just the car.

255.    Nor did the Evidence Control Branch allow her to retrieve her personal items, including important papers (*e.g.*, birth certificate) from the Passat.

256.    The MPD offered her two choices: (1) let the ECB move the Passat from the lot to the curb outside of the lot, which gave her 24 hours to get the car -- otherwise, it will get towed; or (2) leave the Passat with the MPD until the MPD or the prosecutor released the keys.

257.    The Evidence Control Branch staff were extremely rude and disrespectful to Ms. Parrott.

258.    The District also refused to release two of the family iPhones because the MPD believe Mr. Simmons used them at some point.

259.    The District never provided notice of any kind – not even a warrant or an inventory of property taken.

### The MPD seized Mr. Joyner's Toyota for Civil Forfeiture and for Investigation and Held it for almost Two Years before Giving it back.

260.    The MPD seized Mr. Joyner's Toyota Tundra on about May 1, 2010 for civil forfeiture and for investigation and the MPD held it for over a year before giving it back in June 2021.

261.    Mr. Joyner had no actual knowledge of any wrongdoing involving the Toyota Tundra nor did he consent to any wrongdoing involving the Toyota Tundra.

262.    During the time the District held the Toyota Tundra the District never gave Mr. Joyner any of the constitutionally mandated procedural protections in the District's amended civil forfeiture statute such as notice or the right to a prompt post seizure hearing because the MPD maintained a so-called evidentiary hold on the Toyota Tundra until the District was ready to release it. D.C. Code § 41-302(d)( property seized as evidence in a criminal case shall not be subject to this chapter while subject to evidentiary hold in a criminal case).

263.    Mr. Joyner was living in South Carolina when the MPD seized his Toyota Tundra.

264.    Before May 2020 Mr. Joyner lent the Toyota Tundra to his brother who lent it to someone else without Mr. Joyner's knowledge.

265.    In early May 2020 the Toyota Tundra was parked on a street in South East Washington, DC in the 7th Police District ("7D") by someone unknown to Mr. Tyson.

266.    The MPD towed the Toyota Tundra without a warrant and without providing any notice or information about the seizure to Mr. Joyner or anyone else connected with the vehicle.

### Mr. Joyner's communications with the MPD regarding the vehicle and the "criminal investigation" regarding the vehicle.

267.    As it turned out, MPD 7D originally seized and classified the vehicle. Seven D classified the vehicle both as "evidence" in connection as a criminal investigation and for forfeiture.

268.    Seven D was in charge of conducting a criminal investigation and ultimately, obtaining a PD 81-C from the prosecutor.

269.     Mr. Joyner's lawyer began communicating with MPD 7D regarding the vehicle and the "criminal investigation" regarding the vehicle almost as soon as MPD took the vehicle.

270.    On May 5, 2020, an attorney for Mr. Joyner emailed MPD Lieutenant Lavenhouse, Seventh District Special Mission Units, regarding the release of Mr. Joyner's vehicle.

271.    Mr. Joyner's lawyer communicated with MPD and the OAG from May onward through October 26, 2020 trying to obtain the release of Mr. Joyner's Toyota Tundra.

272.    Mr. Joyner's lawyer wrote MPD again on October 26, 2020 without any luck.

273.    MPD has never provided Mr. Joyner with any notice not even a copy of a warrant or an inventory of items seized.

274.    Ultimately MPD stated that on about May 5, 2020 MPD requested a K9 unit to do a walk around the Toyota and a K9 dog had a positive "hit" on the truck so MPD searched it.

275.    The MPD state they found inside a small personal use amount (1 oz.) of a substance they believe is marijuana and a bag with a white powder that the MPD believe is heroin.

276. But, MPD never produced a copy of a DEA-7 to Mr. Joyner or his attorneys.

277. On information and belief, the MPD never submitted the white powder to the Drug Enforcement Administration ("DEA") for analysis and identification.

### Mr. Joyner's communications with the Asset Forfeiture Unit about forfeiture of the Toyota Tundra

278. Mr. Joyner's lawyer, after learning that Mr. Joyner's Toyota Tundra was also held for forfeiture, then began corresponding with Detective Maria Pena, (MPD) Senior Detective Grade 1, NSID (Narcotics and Special Investigations Division) -Asset Forfeiture Unit (the MPD "element" that investigates forfeiture cases to make a written recommendation about whether property should be subject to administrative forfeiture (the first step in forfeiture proceedings) or returned to the owner).

279. Detective Pena told Mr. Joyner's lawyer that the MPD were still conducting a criminal investigation involving the Toyota Tundra.

280. Detective Pena requested that Mr. Joyner submit to an oral examination or provide a written statement about his employment, residence, and dominion and control of the Toyota Tundra, his assets, and ownership of the Toyota Tundra.

281. Because the Toyota Tundra was still subject to a so-called evidentiary hold none of the constitutionally mandated procedural protections in the District's amended civil forfeiture statute such as notice or the right to a prompt post seizure hearing had been triggered. D.C. Code § 41-302(d).

282. As a result, Mr. Joyner never received forfeiture notice or a prompt post seizure hearing for his Toyota Tundra.

283. Mr. Joyner was finally able to recover his Toyota Tundra in May 2021.

### Dreyvon Iracks - The MPD seized Mr. Iracks' Infiniti QX50 SUV on October 18, 2021 for civil forfeiture and for investigation and MPD has held it ever since.

284.    MPD seized Dreyvon Iracks' Infiniti QX50 SUV on October 18, 2021 for investigation and for civil forfeiture and MPD has held it ever since.

285.    MPD seized Mr. Iracks' Infiniti QX50 SUV (towed from a Maryland parking lot), based on a BOLO (a look-out).

286.    Mr. Iracks managed to obtain very limited *pro bono* representation to help him locate and retrieve his vehicle because a CJA lawyer he ran into while at the Superior Court courthouse asking about his vehicle agreed to make a few calls for him.

287.    The CJA lawyer is unable to do more for Mr. Iracks beyond making some calls.

288.    The MPD detective in charge of the investigation states MPD received a report of a "felony shooting," and the MPD detective states that the vehicle in the shooting appears on video and MPD seized Mr. Iracks' Infiniti QX50 SUV believing it was the vehicle in the video.

289.    Apparently the MPD detective does not have a suspect, and he would not say if the driver of the vehicle did anything related to the shooting.

290.    The MPD detective told Mr. Iracks' *pro bono* counsel he wants to interview the car's owner who he believes is Mr. Iracks.

291.     Mr. Iracks' *pro bono* counsel refused without knowing more.

292.    The MPD detective refuses to provide any information about Mr. Iracks' Infiniti QX50 SUV unless Mr. Iracks sits for an interview about the alleged shooting.

293.    Mr. Iracks' *pro bono* counsel then tried to identify the assigned AUSA by calling the Superior Court USAO; he reached the USAO duty person who confirmed that MPD had the car.

294.     The AUSA said no one has become assigned to the case, just the processing of a warrant to search the car.

295.     No case related to Mr. Iracks' Infiniti QX50 SUV has been instituted based on information known to Mr. Iracks or counsel.

296.     Mr. Iracks does not know anything about the shooting and he had no involvement whatsoever. "I have no clue."

297.     Mr. Iracks managed to obtain a public incident report which might relate to Mr. Iracks's Infiniti but it does not state how MPD classified the vehicle, that is, as "evidence" or for forfeiture or both.

298.     On information and belief MPD classified Mr. Iracks' Infiniti QX50 SUV as both as "evidence" and forfeiture.

299.     But, if an unregistered gun or a gun carried by an unlicensed person were used in the shooting the vehicle is arguably subject to civil forfeiture proceedings pursuant to D.C. Code § 7-2507.06a.

300.     The MPD never gave Mr. Iracks notice of any kind not even a copy of a warrant or an inventory of items taken.

301.     Mr. Joyner has never received any forfeiture notice about his Infiniti QX50 SUV.

302.     MPD Detective will not provide CCN number so cannot get

303.     The MPD detective told Mr. Iracks that only prosecutor can release the Infiniti but the MPD detective controls the timing of when to submit the PD 81-C to the prosecutor.

304.     Neither the MPD detective/ investigator nor the AUSA has stated whether the District has searched or processed (including photographed) the vehicle.

### Other Seizures Also Illustrate the Problems with the District's System

**Sharif Abdus-Shakur – Vehicle and iPhone Seized from Uninvolved in Connection with Simple Assault Investigation**

305.    On or about December 14, 2020, the MPD seized a 2005 silver Nissan Altima, Maryland tag 7CX5398 from the owner of the vehicle, Mr. Sharif Abdus-Shakur, without his knowledge, when the car was parked outside of his daughter's apartment building in Washington, D.C.

306.    The MPD did not provide Mr. Shakur with notice of seizure, not even a warrant or an inventory.

307.    So, simply finding his car missing when he went out to get in it, and thinking that the vehicle was stolen, Mr. Shakur and his daughter contacted MPD to file a stolen car report.

308.    MPD informed Mr. Shakur a police report could not be filed because MPD had seized the vehicle in relation to an investigation.

309.    However, MPD refused to provide any warrant or authority used to seize the vehicle.

310.    There have been no arrests or reports filed in regards to this matter.

311.    They learnt the vehicle was being held in property at the Fifth District.

312.    Counsel (retained by the owner to retrieve the vehicle) contacted the Fifth District and was told the property office did not receive a warrant in the paperwork for the vehicle.

313.    The Fifth District confirmed the car was under investigation with the Second District and to contact the detective office.

314.    Counsel (retained by the owner to retrieve the vehicle) on December 23, 2020 filed an emergency motion for return of property in the Superior Court with the D.C. Superior Court Judge-in-Chambers.

315.    About two weeks later, in an order dated January 5, 2021, the Chief Judge of the Criminal Division of the Superior Court denied the motion without prejudice ruling that "[since] no search

warrant has been issued, nor has any criminal prosecution been initiated in connection with the purported seizure of the vehicle, thus it appears that the Criminal Division is without authority or jurisdiction to act upon the request for return of property, absent some additional authority cited on behalf of Mr. Abdus-Shakur." (copy of order attached to the foot of the complaint)

316.    The Chief Judge also noted in the order that, "[t]he Court is forwarding a copy of the Motion to Ms. Lauren Bates, the Chief of the General Crimes Section of the DC Superior Court, as she may be able to provide further assistance."

317.    On January 10, 2021 the District finally agreed to release the car.

318.    Thus the District kept the vehicle about a month.

319.    Ultimately the owner, Mr. Shakur, found out that the MPD were investigating an assault at a store and there were allegations that two people left the store in Mr. Shakur's car.

320.    The MPD also seized and refused to return a smartphone in the car.

321.    At the end of the day the MPD illegally confiscated and detained the car for a month based on the officers' version of "probable cause" which was defective.

322.    The AUSA determined that the vehicle was in no way related to the charge the MPD were investigating at all.

323.    The District never provided notice of any kind – not even a warrant or a return or an inventory of property taken - or explained why the vehicle was taken or held.

### Vehicle Seized from Defendant Charged with CPWL – Held Six Weeks

324.    On 2/1/2021 MPD arrested Mr. Jones (a pseudonym) and the U.S. Attorney filed a criminal complaint charging him with CPWL while he was driving a black Range Rover.

325.    Mr. Jones was driving the black Range Rover despite the revocation of his Maryland driver's license in June 2019, and he was arrested for No Permit.

326.    Mr. Jones' parents own the black Range Rover.

327.    After a search incident to arrest, officers recovered a loaded MMP9 Smith and Wesson Shield semi-automatic 9mm handgun from Mr. Jones's jacket.

328.    The MPD have stated that they believe (based – according to the District - on CCTV and witness statements and other evidence) Mr. Jones was involved in a shooting of another man near or on Kendall Street, N.E. which happened on Thursday, January 14, 2021 but the U.S. Attorney has not charged Mr. Jones in connection with that shooting.

329.    MPD and the AUSA connected to the case have stated that they believe Mr. Jones fled the scene of the January 14, 2021 they believe he was involved in in the black Range Rover.

330.     The vehicle belonged to the arrestee's mother who nothing about the events in connection with the arrestee was arrested.

331.    The U.S. Attorney asked that Mr. Jones be preventively detained pursuant to Section 1322(b)(1(A) but the hold was denied because of Mr. Jones's lack of criminal history and employment. The present Judge also denied heightened supervision because she stated after hearing the testimony and argument that it may turn out that Mr. Jones was acting in self-defense in connection with a home invasion.

332.    Defense counsel for Mr. Jones tried several times via email to obtain the release of the vehicle from the AUSA but the AUSA refused to consent to the release of the vehicle or explain why it was being held.

333.    On 2/19/2021 defense counsel filed a Rule 41(g) motion for return of the vehicle.

334.    Three weeks later, on 3/04/2021, the day before the deadline to respond, government filed a motion for a one week extension to respond to the motion for return of the vehicle.

335.    Finally, on March 11, 2021, the AUSA filed a Notice stating that it had provide a PD 81-C to the Evidence Control Branch stating it had no objection to the return of the vehicle.

336.    After six weeks Mr. Jones' mother finally got her vehicle back.

337.    The District never provided notice of any kind – not even a warrant or an inventory of property taken – to either Mr. Jones or his mother or explained why the vehicle was taken or held.

### Shooting victim's vehicle seized by MPD in July 2021– still not returned

338.    In early July, 2021 Mr. Smith (a pseudonym) was the victim of a shooting while sitting in his vehicle in the District.

339.    He drove himself to a hospital in Maryland where he lives and sought medical care.

340.    He was interviewed by detectives of the MPD but he was not able to help with the investigation.

341.    He later spoke to an MPD Investigator about the incident.

342.    A few days later on July 23, 2021 the MPD towed his car from the front of Mr. Smith's home in Maryland.

343.    When Mr. Smith's counsel retained to retrieve the car asked the MPD Investigator for a copy of the warrant the MPD Investigator would only say "she had a warrant to get, and she's been looking for it."

344.    The Office of Risk Management in a letter dated September 28, 2021 informed Mr. Smith in a letter to counsel retained to retrieve the vehicle that "a legal warrant was issued to seize the vehicle for forensic testing" without stating when the warrant was issued or by what jurisdiction.

345.    Therefor Mr. Smith has no way of verifying whether the vehicle was in fact towed pursuant to a warrant.

346.    Mr. Smith's counsel retained to retrieve the car also asked an AUSA knowledgeable about the case for the return of the vehicle but she said the District needed the vehicle in case there were a defense counsel.

347.    Neither the MPD Investigator nor the AUSA has stated whether the District has searched or processed (including photographed) the vehicle.

348.    The District never provided notice of any kind – not even a warrant or an inventory of property taken - or explained why the vehicle was taken or held.

349.    The closest approximation of notice the District provided was that the Office of Risk Management in a letter dated September 28, 2021 informed Mr. Smith in a letter to counsel retained to retrieve the vehicle that "the vehicle was ordered to be released by the U.S. Attorney's Office and [Mr. Smith] only had to get a "release document" from them and go and pick up his vehicle."

350.    The letter offered no clues as to how or from where Mr. Smith was to obtain the "release document."

351.    The AUSA told Mr. Smith's counsel that the vehicle was being held pursuant to its preservation obligations under Superior Court Rule 16.

### Other cases where MPD seized vehicles and smartphones and held them longer than needed providing notice to the District's and the MPD's policymakers

352.    Discussions with CJA lawyers (lawyers appointed to represent indigent Defendants in prosecutions instituted in Superior Court) indicates that the MPD frequently seize and hold smartphones for months and longer even though the smartphones are not stolen or otherwise relevant to a prosecution or investigation.

353.    The complaint filed in Cameron v. District of Columbia, 21-02908 (APM) details the seizures and overlong retentions of smartphones in many cases in Superior Court especially where no prosecution was initiated or in no-papered arrests.

354.    Plaintiffs in *Cameron* pointed to at least 208 instances of unreasonably protracted seizures of smartphones (and in one case, an iPad) between 2018 and 2021. This does not include the 37 unlawfully prolonged seizures giving rise to the Cameron lawsuit, or the countless others strongly suggested by the existence of a "large bin" in MPD's Evidence Control Branch used to store previously seized smartphones.

355.    Plaintiffs incorporate by reference those seizures here.

356.    In one UUV case the government did agree to release the client's phone but MPD retains the phone five months later.

357.    In a juvenile theft case where the client had two smartphones (neither related to the theft) the case was brought in November 2019, the government finally released the smartphones on June 30, 2020 after multiple months of negotiations.

## SUBSTANTIVE ALLEGATIONS

### Claim One

### Violation of the Fourth Amendment Protection against Unreasonable Retention

358.    Ms. Parrott, Mr. Joyner, and Mr. Iracks re-allege all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

359.    MPD had no evidentiary interest in the vehicles, smartphones, and other property classified as "evidence" after processing it for evidence or after a reasonable opportunity to process it for evidence.

360.     A general policy of keeping seized property until the close of criminal proceedings cannot overcome that the balance clearly weighs in favor of owners, whose interests are much greater than the government's, making the ongoing seizure unreasonable and a violation of the Fourth Amendment.

361.     The Fourth Amendment prohibits "unreasonable searches and seizures of property by the government."

362.     A seizure that is lawful at its inception may nevertheless violate the Fourth Amendment if the manner of its execution or its duration unreasonably infringes the possessory interests protected by the Fourth Amendment.

363.     Even if seizing and retaining vehicles and smartphones to search them and to process them for evidence after they were classified as "evidence" for investigation by the MPD were constitutional, the seizures became unreasonable under the Fourth Amendment after the vehicles and smartphones were searched and were processed for any evidentiary value they might have and photographed or after a reasonable amount of time to do so had passed because there was no probable cause to continue to hold them after all items of evidentiary value had been extracted.

364.     **EXPLICIT POLICY.** The District's official policy is to hold vehicles and smartphones which come into the custody of the District in connection with criminal investigations until the related criminal case (including appeals) is over, or "[i]f no criminal judicial proceeding has been initiated, the material shall be preserved for a period of three years from the date such material was first obtained." E.g., DCMR § 804.3; MPD General Order 601.2 "Preservation of Potentially Discoverable Material" (Feb. 3, 2004).

365.    Additionally, the District and the MPD treat the Property Clerk statute as though it allows the District to keep all vehicles and smartphones seized in connection with criminal investigations for up to a year.

366.    **CUSTOM**. The District had and has a custom of seizing vehicles and smartphones for use in criminal investigations and them holding them for weeks, months and years, or never gave them back even when they were no longer needed as potential evidence because they had no evidentiary value or because the District through its prosecutors and police force had retrieved all the evidentiary valuable in the vehicles or they had had a reasonable amount of time in which to do so. District policy makers acquiesce in the custom.

367.    Based on Plaintiff's counsel's pre-discovery investigation, the MPD has a longstanding policy and/or custom (for over 15 years) of routinely retaining vehicles seized in connection with criminal investigations and classified as "evidence" far longer than needed to process them for any evidentiary value in the vehicles and to preserve that evidentiary value.

368.    The plaintiffs in *Jenkins v. D.C.*, 16-118 (CRC) established the existence of the longstanding policy and/or custom and put the District's policymakers on notice of it.

369.    The *Jenkins* plaintiffs filed three affidavits detailing how MPD held their vehicles for investigation in criminal cases for long periods of time and the affidavits and documents generated by the District and the MPD showed that any evidentiary value in the vehicles could have been processed and recovered in just a couple of weeks. (Ms. Jenkins, vehicle held over a year for investigation; Ms. Taylor's vehicle held three months; Mr. Johnson's vehicle held by MPD over six months after MPD told him they would keep the vehicle until their investigation was over).

370.    The pleadings and the published opinions in *Avila v. Dailey*, 15-02135 (TSC) also support the existence of a custom and gave notice of it to District and MPD policymakers. *Avila v. Dailey*, 246 F. Supp. 3d 347, 358 (D.D.C. 2017)

371.    The pleadings and the published opinions in *Brown v. D.C.*, 15-02135 (CRC) (later Hoyte v. D.C.) also support the existence of a custom and gave notice of it to District and MPD policymakers.

372.    In *Brown/Hoyte* MPD seized thousands of vehicles during the period between 2010 and 2015 and classified the vehicles as both for forfeiture and as "evidence."

373.    The District's litigation in the case was that the vehicles were held as "evidence" and the lengthy periods of detention (months and years) were caused by the need to keep the vehicles as "evidence" in criminal investigations.

374.    Additionally, the seizures and lengthy detentions of months and years beyond the time needed to process vehicles as "evidence" at issue in this case and in the other cases show that many District employees are involved in the seizures and unreasonably lengthy over-detentions. None of the employees has ever tried to hide that the District keeps vehicles seized in connection with investigations in criminal cases for much longer than the time needed to process them for any evidentiary value in them.

375.    Rather, various MPD employees openly followed the same practice in business-as-usual fashion.

376.    The District has vigorously defended to District's and the MPD's practices which creates a reasonable inference that there is an official District and MPD policy and/or custom which District and MPD policymakers knowingly acquiesce in.

377.     It is obvious from the way that the MPD staff handled Ms. Parrott's, Mr. Joyner's, and Mr. Iracks' vehicles that they believed they were handling their cases according to "policy" and the District's litigating position in the motion supports the inference.

378.     Plaintiffs in *Cameron* pointed to at least 208 instances of unreasonably protracted seizures of cell smartphones (and in one case, an iPad) between 2018 and 2021. This does not include the 37 unlawfully prolonged seizures giving rise to this lawsuit, or the countless others strongly suggested by the existence of a "large bin" in MPD's Evidence Control Branch used to store previously seized cell smartphones.

379.     The large number of past incidents of unreasonably retained smartphones, on its own, gave the District and its policymakers constructive knowledge of the custom.

380.     The District knew or should have known or must have known about this custom yet still took no steps to remedy the problem and in fact acquiesced in the custom.

381.     **DELIBERATE INDIFFERENCE.** The MPD implements the District's policies and laws authorizing seizure of vehicles and smartphones in connection with criminal investigations without regard to the owners' rights to the prompt return of their property so that the MPD simply delays all review of seizures and processing of vehicles and smartphones for "potential evidence" until the system, in its sweet time, and with the resources it chooses, is ready to make decisions about returning people's vehicles (and any property in them) and smartphones.

382.     The District's and MPD's set of policies -- or, alternatively, the lack of policies to expedite the release process of vehicles seized in connection with criminal investigations -- amounts to a policy of deliberate indifference to the plaintiffs' constitutional rights. the decision not to take any action to alleviate the problem of detecting missed arraignments constitutes a policy for purposes of § 1983 municipal liability." "The need for different procedures was so obvious that District's and

the MPD's adamant refusal to take action amounted to deliberate indifference to the owners' constitutional rights.

383.    The District failed to respond to the need, of which it had actual or constructive notice, for policies and actions that would prevent it from seizing vehicles and smartphones for use in criminal investigations and them holding them for weeks, months and years, or never giving them back even when they were no longer needed as potential evidence because they had no evidentiary value or because the District through its prosecutors and police force had retrieved all the evidentiary valuable in the vehicles or they had had a reasonable amount of time in which to do so.

384.    The District's policies, customs, and deliberate indifference, as described above, directly, proximately, and affirmatively were the moving force behind the violations of Ms. Parrott's, Mr. Joyner's, and Mr. Iracks' and the other class members' rights described herein.

385.    As a direct and proximate result of this violation Ms. Parrott's, Mr. Joyner's, and Mr. Iracks' and the other class members suffered general and special damages including deprivation of constitutional rights, confinement, associated harm, and emotional distress.

## Claim Two

### Procedural Due Process Claim for failure to provide notice at seizure, after processing vehicle for evidence, and after a prosecution was instituted

386.    Ms. Parrott, Mr. Joyner, and Mr. Iracks re-allege all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

387.    This claim for notice is separate and independent from the claim for notice derived from the claim for prompt post seizure hearings.

388.    The District deprived Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members of their property when it seized their vehicles and their smartphones for use in criminal investigations.

389.    The District never gave Ms. Parrott, Mr. Joyner, and Mr. Iracks or any of the other class members individualized notice at or near the time of seizure of seizure of the vehicles with information about which agency was seizing their vehicles (District for civil forfeiture or Evidence Control Branch as "evidence"), which agency had legal custody of their vehicles (District or Evidence Control Branch) and for which purpose (as potential evidence or for civil forfeiture), and what were the regular procedures for the return of property and what remedies to pursue if property were not returned according to those regular procedures.

390.    The notice should also have informed owners how to file Rule 41(g) motions in Superior Court before criminal cases are instituted or if cases were no-papered if the Superior Court has jurisdiction over such motions because the procedures, if any, are secret.

391.    Additionally, neither the District nor MPD ever gave Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members notice after MPD and any other involved agency was finished processing their vehicles for evidence, and after a prosecution was instituted if a prosecution were initiated more than three days after seizure. As a result, owners carried the burden of having to monitor MPD investigations.

392.    This pattern and policy of the District violated owners' procedural due process rights under the Fifth Amendment to the United States Constitution.

393.    Alternatively, the due process clause of the Fifth Amendment required the District to have a policy of providing the notice described in this claim but the District had no such policy requiring such notice and the failure to establish a policy to provide such notice was the cause the violation of the constitutional rights of Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members.

394.    Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members were injured thereby and suffered damages as described herein.

**Claim Three**

**Due Process Claim for failure to provide prompt post seizure hearings and notice of the hearings**

395.    Ms. Parrott, Mr. Joyner, and Mr. Iracks re-allege all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

396.    The District deprived owners of their property rights in their vehicles, smartphones, and other property by seizing it and holding it long after it was needed for any evidentiary purposes.

397.    The District seized Ms. Parrott's and the other class members' vehicles and smartphones for use in criminal investigations as potential evidence and held them for months and years or never gave them back even when they were no longer needed as potential evidence because they had no evidentiary value or because the District through its prosecutors and police force had retrieved all the evidentiary valuable in the vehicles or they had had a reasonable amount of time in which to do so.

398.    The District never gave them prompt post seizure hearings at which they could challenge the seizure or the retention of their vehicles in violation of their procedural due process rights under the Fifth Amendment to the United States Constitution.

399.     Nor did the District ever give them notice of such prompt post seizure hearings in violation of their procedural due process rights under the Fifth Amendment to the United States Constitution.

400.     It is the pattern, policy, and practice of the District to seize and to retain indefinitely property and in some cases to keep such vehicles without providing prompt post-seizure hearings at which owners can challenge the District's seizure and continued retention of their vehicles and without notice of the required hearings.

401.     Alternatively, the due process clause of the Fifth Amendment required the District to provide prompt post seizure hearings and the notice for them but the District had no such policy requiring such prompt post seizure hearings and notice and the failure to establish a policy to provide such hearings notice was the cause the violation of the constitutional rights of Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members.

402.     Alternatively the District's laws authorizing the seizure and retention of vehicles and smartphones to recover "potential evidence" from them is unconstitutional because it lacks a provision for prompt post seizure hearings because the District bears the burden of providing the prompt post seizure hearings and justifying the retention past the time needed to process the property for "potential evidence."

403.     Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members were injured thereby and suffered damages as described herein.

## Claim Four
### Right to Return of Property when no longer needed by the District

404.     Ms. Parrott, Mr. Joyner, and Mr. Iracks re-allege all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

405.    The District seized Ms. Parrott's, Mr. Joyner's, and Mr. Iracks' and the other class members' vehicles and smartphones for use in criminal investigations and held them for months and years or never gave them back even when they were no longer needed as potential evidence because they had no evidentiary value or because the District through its agents had retrieved all the potential evidence in the vehicles and the smartphones or they had had a reasonable amount of time in which to do so.

406.    MPD also forces owners in many cases to file Rule 41(g) motions to force owners including defendants to obtain a ruling from a court on whether the MPD have satisfied their Criminal Rule 16 preservation obligations.

407.    This case actually involves two deprivations: the first being the initial seizure of the property and the second being the District's subsequent and continued refusal to return the property to owners when it was no longer needed as evidence or after a reasonable opportunity to process it for evidence.

408.    The District and MPD's policy of forcing owners to file motions for the return of their property during an ongoing case to get their property back or to wait till the MPD in its sweet time, and with the resources it chooses is ready to make releases constitutes a second deprivation which violates due process.

409.    Regardless of whether District could foresee the need to seize vehicles and smartphones in individual seizures, once the District had seized vehicles and smartphones and the MPD had the vehicles and smartphones in its custody, the District and the MPD could foresee the continued deprivation of the vehicles according to standard procedures after the MPD and other District agencies have finished processing the vehicles for evidentiary value or after an opportunity to process them for evidence.

410.    There was a known risk that upon finishing processing the vehicle and smartphones, or after an reasonable opportunity, which was a foreseeable point of decision making and a predictable moment in time, MPD would continue to hold vehicles and smartphones to the detriment of owners although no longer needed as "evidence."

411.    Requiring the claimants to file Rule 41(g) motions (in the narrow range of cases when they were available) or failing to otherwise prompt post seizure hearings when the District has no need for the property violates the owners' due process rights.

412.    The District was deliberately indifferent to the rights of owners by failing to provide such hearings.

413.    Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members were injured thereby and suffered damages as described herein.

Claim Five

Taking and Keeping Ms. Parrott, Mr. Joyner, and Mr. Iracks' vehicles and smartphones constituted a "Taking" of Personal Property

414.    Ms. Parrott, Mr. Joyner, and Mr. Iracks re-allege all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

415.    Claim Five alleges an unlawful taking under the Fifth Amendment.

416.    The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V.

417.    Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members possessed a property interest that is constitutionally protected in their vehicles and smartphones and the District deprived them of that interest by keeping their vehicles and smartphones past the time needed to search, photograph and process and extract the evidentiary value from them.

418.    The MPD took Ms. Parrott, Mr. Joyner, and Mr. Iracks' vehicles and cell smartphones and other property for a public purpose when it seized their property.

419.    Taking the property to extract the evidentiary value from it was for a public use.

420.    Alternatively, the MPD "took" Ms. Parrott's vehicles and cell smartphones and other property when it continued to detain the property after the District had extracted the evidentiary value from the property or after a reasonable time needed to extract the evidentiary value from the property.

421.    Retaining Ms. Parrott's, Mr. Joyner's, and Mr. Iracks' vehicles and cell smartphones and other property after the District had extracted the evidentiary value from the property or after passage of the time needed to extract the evidentiary value from the property constitutes a "taking" that is not for a public purpose.

422.    The District has not paid Ms. Parrott, Mr. Joyner, and Mr. Iracks just compensation.

423.    The District never obtained title to the vehicles using the civil forfeiture procedure.

424.    The District seized and kept vehicles pursuant to the District's policy of keeping such property until any case were over or - if no case were filed – for three years.

425.    The District seized and kept vehicles pursuant to a custom of which the District was or should have been or must have been aware and in fact acquiesced in the takings and the failure to remedy the custom was the moving force of the takings.

426.    The District was deliberately indifferent to the rights of owners by instituting the takings without providing compensation when policymakers such as the Chief was aware of the problem.

427.    Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members were injured thereby and suffered damages as described herein.

## Claim Six

**Procedural Due Process Claim for failure to provide notice and prompt post seizure hearings for vehicles and smartphones classified as "evidence" and also seized for forfeiture determinations**

428.    Mr. Joyner and Mr. Iracks re-allege all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

429.    This claim for notice and prompt post seizure hearings is separate and independent from the claims for notice and prompt post seizure hearings stated above.

430.    This claim is brought by Mr. Joyner and Mr. Iracks on behalf of themselves and all class members (the "Forfeiture Determination class") whose vehicles and smartphones and cash the MPD classified as "evidence" and also seized for forfeiture determinations.

431.    The District seized Mr. Joyner's and Mr. Iracks' and Forfeiture Determination class members' vehicles and smartphones and cash for forfeiture determinations as well as classifying the property as "evidence" and held it for months and years or never gave it back but the District never gave them notice at or near seizure and a prompt post seizure hearing at which they could challenge the seizure or the retention or return of their property pending forfeiture determinations in violation of their procedural due process rights under the Fifth Amendment to the United States Constitution.

432.    It is the pattern, policy, and practice of the District to seize and retain indefinitely property including vehicles and smartphones for forfeiture determinations without providing prompt post-seizure hearings at which owners can challenge the District's seizure and continued retention of their property because the MPD classify the property as "evidence" and leave the "evidentiary holds" on the property thus denying such owners the constitutionally mandated procedural protections in the District's amended civil forfeiture statute such as notice or the right to a prompt post seizure hearing.

433.     In a classic catch 22, the MPD's classifying property subject to an "evidentiary hold" as "for forfeiture" as well cuts off an owner's access to Rule 41(g) to the extent it provides a remedy because Superior Court judicial officers have no ancillary jurisdiction to hear motions for return of property pursuant to Super. Ct. Crim. R. 41(g) after a vehicle or a smartphone or cash is held for a forfeiture determination, and the property is in the custody of the "District." D.C. Code § 41-303(b)(1).

434.     And, conversely, a vehicle owner has no access to a statutory prompt post seizure retention hearing under the District's civil forfeiture statute until the evidentiary holds are removed. D.C. Code § 41-306(a).

435.     The District seized and retained the property pursuant to the policies, customs and practices described above, and the District was deliberate indifference to owners' rights.

436.     Mr. Joyner and Mr. Iracks and the Forfeiture Determination class members were injured thereby and suffered damages.

## Claim Seven

## Common Law Wrongful Detention of Personal Property

437.     The common law prohibits unlawful detention of property even if the original seizure of the property were lawful.

438.     Each owner satisfied D.C. Code § 12-309 because the District documented the details of each seizure and wrongful detention in numerous "police reports."

439.     Where public officials "unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity . . . ," the true owner may "bring his possessory action to reclaim that which is wrongfully withheld."

440.    The tort applies when a tortfeasor has converted a chattel that has come back to the owner's possession, either through self-help, judicial proceedings or otherwise, and when the conduct that deprived the owner of the use of a chattel was not a conversion.

441.    Detaining Ms. Parrott, Mr. Joyner, and Mr. Iracks' and the other class members' vehicles and smartphones constituted unlawful detentions of their property.

442.    The District is liable under the doctrine of *respondeat superior* for the intentional torts of its employees and others acting on its behalf in seizing and wrongfully detaining the property.

443.    The owner of the subject matter is entitled to recover as damages for the loss of the value of the use, at least the rental value of the chattel or land during the period of deprivation. This is true even though the owner in fact has suffered no harm through the deprivation, as when he was not using the subject matter at the time or had a substitute that he used without additional expense to him.

444.    Ms. Parrott, Mr. Joyner, and Mr. Iracks and the other class members were injured by the wrongful detentions and suffered damages as described herein.

## CLASS ACTION ALLEGATIONS

### Class Allegations for Each Class

445.    Ms. Parrott, Mr. Joyner, and Mr. Iracks as Named Plaintiffs and proposed class representatives ask the Court to certify under Rules 23(a) and 23(b)(2) and (b) (3) the separate classes defined below on their own behalf and on behalf of the classes defined below injured (or presently subject to injury) by the policy and practices and customs of the District described herein.

**Claim One: Fourth Amendment class.**

446.    Ms. Parrott, Mr. Joyner, and Mr. Iracks bring this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person:

(1) from whom the District seized vehicles or smartphones or other property during the period from three years before the date of filing of the original complaint in this case to the termination of this action; (2) for use in criminal investigations (even if the vehicles were also held for forfeiture determinations); and (3) held the vehicles or smartphones for more than thirty days.

## Claim Two: No notice class.

447.    Ms. Parrott, Mr. Joyner, and Mr. Iracks bring this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person (1) from whom the District seized property during the period from three years before the date of filing of the original complaint in this case to the termination of this action; (2) for use in criminal investigations (even if the property were also held for forfeiture determinations); and (3) without giving them at the time of seizure, or after the District had a reasonable time to process the vehicle for evidence, or after a case in Superior Court had been instituted, (4) individualized written notice of seizure of property, an inventory of the property, and individualized notice of procedures for the return of the property.

## Claim Three: No prompt post seizure hearings class.

448.    Ms. Parrott, Mr. Joyner, and Mr. Iracks bring this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person (1) whose property from three years before the filing of the initial complaint until the termination of this case has been, or will be, (2) seized by the District of Columbia for use in criminal investigations (even if the property were also held for forfeiture determinations); and (3) given into the custody of the District and to (4) to whom the District did not provide a prompt post-seizure hearing before a neutral arbiter at which such person could test the validity of the seizure and the validity of the continued or continuing government retention of the property pending any forfeiture

determination or investigative or evidentiary holds or for any other reason; (5) within 30 days of the date of the seizure.

## Claim Four: Right to return class.

449.    Ms. Parrott brings this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person (1) from whom the District seized property during the period from three years before the date of filing of the original complaint in this case to the termination of this action; (2) for use in criminal investigations; and (3) failed to return it to him or her; (3) without giving him or her individualized notice and a prompt post seizure hearing; (4) within 30 days of the date of the seizure.

## Claim Five: Takings class.

450.    Ms. Parrott brings this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person (1) from whom the District seized property during the period from three years before the date of filing of the original complaint in this case to the termination of this action; (2) for use in criminal investigations (even if the vehicles were also held for forfeiture determinations); and (2) failed to return it to him or her; (3) without giving him or her compensation.

## Claim Six: Forfeiture determination class.

451.    Mr. Joyner and Mr. Iracks bring this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person (1) from whom the District seized property during the period from three years before the date of filing of the original complaint in this case to the termination of this action; (2) for use in criminal investigations; (3) classified the property as "evidence" and instituted a forfeiture determination:

and (4) failed to return it to him or her; (5) without giving him or her individualized notice and a prompt post seizure hearing; (6) within 15 days of the date of the seizure.

## Claim Seven: Wrongful detention class.

452.    Ms. Parrott, Mr. Joyner, and Mr. Iracks brings this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person: (1) from whom the District seized property during the period from three years before the date of filing of the original complaint in this case to the termination of this action; (2) for use in criminal investigations (even if the vehicles were also held for forfeiture determinations); and (3) failed to return it to him or her; (4) without giving him or her individualized notice and a prompt post seizure hearing; (5) within 30 days of the date of the seizure.

### Class Allegations Applicable To All Classes

453.    Certification of a class under Federal Rule of Civil Procedure 23(b)(2) is appropriate, because defendant had a policy and engaged in a pattern and practice of conduct that has uniformly affected all members of the class and declaratory relief against Defendant will benefit each and every plaintiff and class member.

454.    The classes are entitled to declaratory relief.

455.    Certification of classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and a class action is superior for the fair and efficient adjudication of this controversy as detailed below.

456.    Regarding the Named Plaintiff, and members of the classes, there are no individual questions on the issue of liability.

457.    Each class is so numerous that joinder of all members is impracticable. The exact number of class members is unknown to plaintiffs at this time, but, based on MPD disclosures, documents,

and representations to this Court in other cases, is likely to consist of at least over 100 people for each class.

458.    The Named Plaintiff's claims are typical of the claims of the other members of the class, because the Named Plaintiff and all other members of each class to which they belong were injured by exactly the same means.

459.    The Named Plaintiff will fairly and adequately protect the interests of the members of each class to which they belong and has retained counsel who are competent and experienced in complex federal civil rights class action litigation.

460.    The Named Plaintiff has no interests that are contrary to or in conflict with those of each class to which they belong.

461.    The Named Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action, and the class action is superior to any other available means to resolve the issues raised on behalf of the Classes. The class action will be manageable because so many different records systems exist from which to ascertain the members of the putative class such as the MPD's arrest database and the District's property database EvidenceOnQue and paper records.

462.    Defendant District of Columbia has within its computerized records (the MPD's booking databases; and Evidence on Cue, the database in place at property division since 2009) and paper records the names and addresses of all the current and past class members.

463.    Class treatment will be superior because liability can be determined for each Named plaintiff and each class member on a class wide basis either as a matter of law or by using data from the police reports as supplemented by the District's computerized databases.

464.    Actual damages can also be determined on a class wide basis through use of expert testimony and the District's own valuations of similar vehicles.

465.    General damages can be ascertained on a class-wide basis.

## RELIEF DEMANDED

Each Named Plaintiff respectfully requests that this Court grant them and the classes they represent the following relief:

A.      Enter a judgment in favor of Ms. Parrott, Mr. Joyner, and Mr. Iracks and the classes described herein;

B.      Enter injunctive relief in the form of an order compelling the District to provide notice at seizure and by mail to each owner whose vehicle or smartphone the District seizes in connection with a criminal investigation spelling out the retrieval procedures.

C.      Enter injunctive relief in the form of an order compelling the District to provide prompt post seizure hearings to each person whose vehicle or smartphone the District seizes in connection with a criminal investigation and holds more than five business days.

D.      Enter injunctive relief in the form of an order compelling the District to provide prompt post seizure hearings to each person whose vehicle or smartphone the District seizes in connection with a criminal investigation and holds more than five business days.

E.      Enter injunctive relief in the form of an order compelling the District to provide notice at or near seizure and prompt post seizure hearings to each person whose vehicle or smartphone the District seizes both in connection with a criminal investigation and for a forfeiture determination.

F.      Enter injunctive relief in the form of an order compelling the District to establish regular procedures for the return of vehicles, smartphones and other property seized in

connection with criminal investigations when the District or the MPD no longer needs the property.

**G.**     Enter such other judgments for injunctive relief as this Court deems just and proper.

**H.**     Enter a declaratory judgment declaring the District's implementation of its policies for seizing vehicles is potential evidence is unconstitutional because the District did not provide prompt post seizure hearings at which owners could challenge the validity of the seizure and retention of their money cars or compensation, and award plaintiffs and absent class members nominal damages.

**I.**     Enter such other declaratory judgments as this Court deems just and proper and award plaintiffs and absent class members nominal damages.

**J.**     Enter a judgment awarding the Named Plaintiff and class members damages including the amounts the value of the loss of access to their vehicles and smartphones and the loss of the vehicles and smartphones and upkeep of the vehicles and smartphones during seizure, and other damages including prejudgment interest, and compensatory damages for any injury attributable to loss of their property and loss of their property's use and damages for the value of their time devoted to its retrieval and other damages, and attorney fees; as well as equitable and declaratory relief.

**K.**     Enter a judgment awarding plaintiffs attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 1988; and

**L.**     Grant such other relief as this Court deems just and proper.

| Respectfully submitted, | |
|---|---|
| | |

Amended Class Action Complaint • *Parrott v. Government of the District of Columbia*

|  |  |
|---|---|
| /s/ William Claiborne<br>**WILLIAM CLAIBORNE**<br>D.C. Bar # 446579<br><br>Counsel for Named Plaintiffs and the Classes<br><br>717 D Street, NW<br>Suite # 300<br>Washington, DC 20004<br>Phone 202/824-0700<br>Email clairbornelaw@gmail.com |  |

## JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.


/s/William Claiborne
**WILLIAM CLAIBORNE**
D.C. Bar # 446579
Counsel for Plaintiffs and the Classes